IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW S. HARRIS, | ) | CASE NO. 1:13-cv-00260 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION,[1] | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Matthew S. Harris ("Plaintiff" or "Harris") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying his application for social security disability benefits.  Doc. 1.  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to

the consent of the parties.  Doc. 15.   As explained more fully below, the Court **AFFIRMS** the

Commissioner's decision.

## I.  Procedural History

Harris filed an application for Supplemental Security Income ("SSI") on January 25,

2010.  Tr. 59-61, 144-147.  He alleged a disability onset date of August 26, 2009 (Tr. 144, 164),

and claimed disability due to stroke, PTSD, anxiety, panic, depression, and testicular cancer[2] (Tr.

62, 68, 169, 202, 208, 210, 219).  After initial denial by the state agency (Tr. 62-64), and denial

upon reconsideration (Tr. 68-70), Harris requested a hearing (Tr. 71).  On August 9, 2011,

Administrative Law Judge Ben Barnett ("ALJ") conducted an administrative hearing.  Tr. 36-58.

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to FED. R.
CIV. P. 25(d), she is hereby substituted for Michael J. Astrue as the Defendant in this case.

[2] Harris was diagnosed with cancer in 2010 after he filed his application for SSI and that condition was considered
as part of the reconsideration determination.  Tr. 40, 68, 196, 210, 402.

In his September 1, 2011, decision (Tr. 17-35), the ALJ determined that Harris had not been under a disability since January 25, 2010, the date his application was filed.  Tr. 20, 29. Harris requested review of the ALJ's decision by the Appeals Council.  Tr. 133-141.  On December 7, 2012, the Appeals Council denied Harris's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.       Personal, educational and vocational evidence

Harris was born in 1979.  Tr. 144.  He lives with his parents.  Tr. 46, 145.  He has two minor children who live with their mother.  Tr. 256, 268.  Shortly before his alleged disability onset date, Harris had been incarcerated for nine years.  Tr. 41.  Harris completed high school[3] and took some college courses while incarcerated.[4]  Tr. 51, 170.  Beginning in 1996, Harris worked as an assistant manager at a video game store, as a laborer/food preparer at a fast food restaurant, and a stocker at a grocery store.  Tr. 42-44, 171, 180.  He stopped working because of his incarceration.  Tr. 170.  Following his release from prison, Harris applied for a few jobs, including a job at a plant nursery and as a car porter at a car dealership.  Tr. 41.  He applied for the jobs because his parents were nagging him about not taking care of things.  Tr. 41.  He did not receive any callbacks and did not think he would have been able to perform the jobs because of his physical limitations. Tr. 41.  For example, he indicated he probably would not have been able to perform the nursery job because it would have involved standing and he has problems standing.  Tr. 41-42.

---

[3] Harris was home schooled for part of his education.  Tr. 269, 279.

[4] Harris was incarcerated for a rape conviction and released on or about August 24, 2009.  Tr. 267, 279.

**B.      Medical evidence**

**1.      Treatment records**

Upon his release from prison, Harris was referred to the Nord Center for continued psychiatric treatment.  Tr. 267.  Harris saw psychologist Thomas J. Haglund on September 22, 2009.  Tr. 256.  During that session, Dr. Haglund noted that Harris had been on Prozac while incarcerated and he had received a refill from his primary care physician.  Tr. 256.  Dr. Haglund and Harris agreed to continue counseling sessions to talk about his childhood abuse issues.  Tr. 256.  Dr. Haglund noted that Harris had a good support system, including parents, a cousin and ex-fiance.  Tr. 256.  Harris was worried about his children whom he said were residing with their allegedly abusive mother in Columbus.  Tr. 256.  On October 1, 2009, during a counseling session with Dr. Haglund, Harris reported that he had gone to the hospital with what he believed was a "mini-stroke" but it was a panic attack.  Tr. 255.  He was given medication to treat anxiety. Tr. 255.  Harris indicated that he was upset by things going on in his life, including having been denied contact with his children and that his ex-finace was going to stay with her boyfriend rather than reunite with him.  Tr. 255.  Harris was scheduled to see Dr. Paras the following week. Tr. 255.

On October 9, 2009, Dr. Carolyn Paras, M.D., saw Harris and conducted a psychiatric evaluation.  Tr. 267-270.  Harris reported that, since being released from prison, he was having panic attacks about 2-4 times each day, lasting a half-hour, because of the stress of not being able to find a job due to his legal history. Tr. 267.  Additionally, he reported that he had been having trouble being in large groups which was also making it harder to find a job.  Tr. 267.  Harris relayed information with respect to the recent panic attack he had experienced and for which he

was treated at the emergency room.  Tr. 267.  He stated that, prior to going to the emergency room, he had been experiencing symptoms of numbness on his face, chest pain, shortness of breath, rapid heartbeat and dizziness for about an hour.  Tr. 267.  Harris indicated that he had been sleeping poorly and his appetite had decreased.  Tr. 267.  Harris reported a history of depression and panic attacks since being a child.  Tr. 268.   He reported having a good relationship with his parents and indicated that they had remained supportive.  Tr. 268.  His relationship with his sister had improved.  Tr. 268.

Dr. Paras indicated that Harris was calm and cooperative.  Tr. 269. He was dressed casually and had fair hygiene and good eye contact.  Tr. 269.  His affect was mildly restricted and his speech was normal in rate, volume and tone.  Tr. 269.  Harris denied hearing voices or seeing things and no delusions were elicited.  Tr. 269.  He denied having suicidal or homicidal thoughts.  Tr. 269.  Dr. Paras noted that Harris was cognitively intact, alert and oriented.  Tr. 269.  His thoughts were organized and his answers were appropriate.  Tr. 269.  His insight and judgment seemed fair.  Tr. 269.  Dr. Paras's diagnoses included posttraumatic stress disorder; panic disorder with agoraphobia, R/O social phobia; dysthymia; and polysubstance abuse in full remission.  Tr. 269.  Dr. Paras recommended a continued regimen of medication and sobriety.  Tr. 269.  She advised Harris that he should follow up with his appointments as scheduled and call if his symptoms worsened or if he encountered problems with his medication.  Tr. 270.

Dr. Haglund and other individuals at the Nord Center continued to treat Harris through 2011.[5]  Tr. 514-540.  In October of 2010, Harris reported that he was having problems leaving the house and experiencing increased panic symptoms.  Tr. 527-530.  He was feeling as though people were staring at him and laughing at him because of his cancer surgery and loss of testicle.

---

[5] Also in 2011, after being terminated from Nord Center for too many no shows (Tr. 721), Harris received some mental health counseling through the Far West Center.  Tr. 719-738.

Tr. 529.  In early 2011, Harris reported a lot of stress.  Tr. 521-522.  His fiancé had broken up with him and left him with credit card debt.  Tr. 521.  He was worried about going to prison because he had lied on credit card applications about his work history.  Tr. 521.  He was having trouble looking for work because he gets panic symptoms when out in public.  Tr. 521.  Harris was requesting a letter from Dr. Haglund for his social security attorney regarding his "diagnosis, meds, and psychological obstacles to work – social anxiety and panic symptoms."  Tr. 519.

### 2.    Opinion evidence

#### a.    Treating psychologist

On April 12, 2010, Dr. Haglund completed a Mental Status Questionnaire (Tr. 262-264) and a Daily Activities Questionnaire (Tr. 265-266).  Dr. Haglund reported that he had first seen Harris on September 3, 2009, and last seen him on February 2, 2010.

In the Mental Status Questionnaire, Dr. Haglund stated that Harris's flow of conversation and speech were normal; he had anxiety, depression, low self-esteem, and poor sleep; he reported panic attacks; he had no psychotic symptoms; his orientation was intact; and his insight and judgment were fair.  Tr. 262.   Dr. Haglund also indicated that Harris's ability to remember, understand and follow directions was intact and he had no reported problems maintaining attention but his ability to sustain concentration, persist at tasks, and complete them in a timely fashion were affected by his anxiety and depression.  Tr. 263.  Dr. Haglund indicated that Harris felt that others were talking about him and as a result he experienced social anxiety.  Tr. 263.  Dr. Haglund also indicated that Harris's ability to react to pressures in work settings or elsewhere would be impacted by the fact that he is prone to panic episodes, he experiences flashbacks due to past childhood abuse, and he has trouble controlling his anger.  Tr. 263.  Dr. Haglund stated

that Harris's diagnoses included: PTSD, panic disorder with agoraphobia, dysthymia, and polysubstance dependence in remission. Tr. 263.

In the Daily Activities Questionnaire, Dr. Haglund stated that Harris was living with his parents and he had a very good relationship with them and his sister. Tr. 265. Dr. Haglund stated that Harris was capable of handling things on his own, including household chores, personal hygiene, shopping, driving/taking public transportation, and banking and bill paying. Tr. 266. Dr. Haglund also stated that Harris's panic episodes would significantly affect his concentration and ability to stay on task or cope with stress. Tr. 265.

Notwithstanding his completion of the Questionnaires on April 12, 2010, in August of 2010, in response to the Bureau of Disability Determination's request for completion of forms, Dr. Haglund stated, "I do not know client well enough to complete this paperwork." Tr. 384.

### b. State agency reviewing physicians

On April 21, 2010, state agency reviewing physician Bruce Goldsmith, Ph.D., completed a Mental RFC (Tr. 289-292) and a Psychiatric Review Technique (Tr. 293-306). In the Mental RFC, Dr. Goldsmith rated Harris's mental abilities in 20 categories.[6] Tr. 289-290. In the Functional Capacity Assessment section of the Mental RFC, Dr. Goldsmith opined that Harris "is still able to perform simple to moderately complex, routine work in a low-stress environment without strict production quotas or time constraints. He is limited to superficial social interaction with a familiar few." Tr. 291.

---

[6] In 13 of those categories, Dr. Goldsmith opined that Harris's abilities were not significantly limited. Tr. 289-290. Dr. Goldsmith rated Harris's abilities in the 7 other categories as moderately limited. Tr. 289-290. Those 7 categories included: (1) the ability to maintain attention and concentration for extended periods; (2) the ability to work in coordination with or proximity to others without being distracted by them; (3) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) the ability to interact appropriately with the general public; (5) the ability to ask simple questions or request assistance; (6) the ability to accept instructions and respond appropriately to criticism from supervisors; and (7) the ability to respond appropriately to changes in the work setting. Tr. 289-290.

In the Psychiatric Review Technique, Dr. Goldsmith opined that Harris's impairments did not meet a Listing.  Tr. 293-306.  However, he concluded that Harris had medically determinable impairments of dysthymia (Tr. 296); panic disorder, PTSD (Tr. 298); and polysubstance dependence in full remission (Tr. 301).  Dr. Goldsmith also opined that Harris had mild limitations in his activities of daily living and moderate limitations in maintaining social functioning and in maintaining concentration, persistence, or pace.  Tr. 303.

On reconsideration of Harris's claim, on September 22, 2010, state agency reviewing physician Frank Orosz, Ph.D., considered Harris's allegations that his condition was worsening. Tr. 469.  He affirmed Dr. Goldsmith's April 21, 2010, assessment.  Tr. 469.

**C.    Testimonial evidence**

**1.    Harris's testimony**

Harris was represented and testified at the administrative hearing.  Tr. 41-52.  Harris testified about his past work experience, daily activities, and his physical and mental impairments and treatment for his impairments.  Tr. 41-52.

With respect to his cancer diagnosis and treatment, Harris's first surgery was in July of 2010.  Tr. 45.  Harris was not required to undergo chemotherapy or radiation for his cancer.  Tr. 45.  His cancer had not returned but he continued to have left groin pain.  Tr. 45.   He indicated that, if he did not have the pain, he would "be partway decent."  Tr. 45.  He experiences pain when he stands and walks.  Tr. 46.  He can stand for about a half-hour before having to sit down. Tr. 46.  He sits down frequently and takes breaks.  Tr. 46.  However, if he sits for a really long period of time, he experiences pain while sitting.  Tr. 46.  He takes pain medication, which makes him very tired.  Tr. 44-45.  He has talked with his doctors about the medication making him sleepy but his doctors have indicated that the pain medication is the only treatment currently

available.  Tr. 45.   In May of 2011, Harris underwent an exploratory surgery to determine
whether he had a hernia.  Tr. 46.  No hernia was found.  Tr. 46.  His doctor suggested that he put
in a device to stimulate Harris's nerves in an attempt to alleviate his pain.  Tr. 46.

Harris described his typical day.  Tr. 46-47.  He wakes up between 8:00 a.m. and 10:00
a.m.  Tr. 46-47.  If he does not have a doctor's appointment, he usually lies in bed and watches
television.  Tr. 47.  He enjoys police shows.  Tr. 47.  He sometimes follows the plot of shows
but, at times, he finds himself not paying attention.  Tr. 47.  He stated that he plays poker on the
computer and estimated using the computer two or three times each week for about an hour at a
time.  Tr. 47.  He will occasionally vacuum but he has to sit down and rest halfway through.  Tr.
47.  He will occasionally help with the dishes but he does not do his own laundry or cooking and
does not assist with the lawn work.  Tr. 48.

Harris indicated that he had been dating his girlfriend since 2001 and she was his best and
only friend.  Tr. 50.  She did not live with him but lived nearby.  Tr. 47-48.  She usually shopped
for him.  Tr. 47-48.  On occasion, he would accompany his girlfriend on shopping trips.  Tr. 47-
48.  However, since he tried to avoid being around people, he only went shopping with his
girlfriend if it was late at night because there are fewer people shopping at that time. Tr. 47-48.
If it looked like there were a lot of people at a store, he and his girlfriend would leave and not go
in.  Tr. 50.  Harris gets anxious when he is around people.  Tr. 50.  Part of the problems is that,
when Harris hears people laughing or talking, he feels that they are talking about him.  Tr. 50.
He has between five and seven doctor's appointment each month.  Tr. 51.  He manages those
visits and being around other people by sitting in an area of the waiting room where he does not
have to see people and he tunes people out so he does not become as anxious.  Tr. 51.  He gets
nervous and anxious around family members whom he is not around all the time.  Tr. 51.  He

attended classes while in prison.  Tr. 51.  There were approximately 10 students in his classes.
Tr. 51.  He usually sat in the back, away from others and, since he had been incarcerated over the
years, he knew most of the individuals in the class.  Tr. 51.  In classes that involved presentations
or speeches, his teachers accommodated him and allowed him to give his presentations to just the
teacher.  Tr. 52.  While incarcerated, Harris received mental health treatment, including
counseling and medication.  Tr. 52.

The ALJ questioned Harris about a note in one of his medical records which indicated
that he was worried about having lied about his work history on a credit card application.  Tr. 49.
Harris indicated that, following his release from prison, he had received a few pre-approved
credit card applications and received a credit card but had some problems paying on the card.
Tr. 49-50.  He had since become current on the bill.  Tr. 49-50.  He denied having lied on a credit
card application.  Tr. 50.

### 2.       Vocational Expert's testimony

 Vocational Expert ("VE") Kevin Zhuang Yi testified at the administrative hearing.  Tr.
53-57, 129.  The VE described Harris's past work as an assistant manager in a video store as a
light level, semi-skilled position.  Tr. 53.  He described Harris's past work as a fast food worker
and as a stock person as medium and light level, unskilled positions.  Tr. 53-54.  The ALJ
proceeded to ask the VE hypothetical questions.  Tr. 54.

In the first hypothetical, the ALJ asked the VE to assume a hypothetical individual the
same age as Harris and having the same education and work experience who was limited to
medium exertional work and a low-stress job, defined as no more than occasional changes in a
work setting; limited to a work environment with no production rate or pace work; no interaction
with the public; and only occasional interaction with co-workers.  Tr. 54.  The VE indicated that

the described individual would be capable of performing Harris's past work as a night stock clerk, a medium exertional, unskilled position. Tr. 54. The VE also indicated there would be other jobs available in the national economy that the described individual could perform, including: (1) laundry worker with approximately 3,000 jobs available statewide and 80,000 jobs available nationwide; (2) industrial cleaner with approximately 60,000 jobs available statewide and 1,000,000 available nationwide; and (3) dry cleaner helper with approximately 10,000 jobs available statewide and 40,000 available nationwide. Tr. 54-55.

In the second hypothetical, the ALJ asked the VE to assume the hypothetical individual described in the first hypothetical except, instead of being limited to medium exertional level work, the individual would be limited to light exertional work. Tr. 55. The VE indicated that the described individual would be unable to perform any of Harris's past work but there would be other jobs available in the national economy that the described individual could perform, including: (1) housekeeping cleaner with approximately 2,000 jobs available statewide and 100,000 jobs available nationwide;[7] (2) product marker with approximately 7,000 jobs available statewide and 150,000 available nationwide; and (3) hand trimmer with approximately 2,200 jobs available statewide and 40,000 available nationwide. Tr. 55.

In the third hypothetical, the ALJ asked the VE to assume the same individual described in the second hypothetical except the individual would be further limited to no more than simple, routine and repetitive tasks and no more than four-step tasks. Tr. 55-56. The VE indicated that the described individual would be unable to perform any of Harris's past work but would be able

---

[7] The VE noted that he was reducing the numbers for the housekeeping cleaner position because of the public contacts and other restrictions and indicated that the reduced numbers were for night cleaning of office buildings. Tr. 55.

to perform other work in the national economy as described in response to the second
hypothetical.  Tr. 56.

In the fourth hypothetical, the ALJ asked the VE to assume a hypothetical individual the
same age as Harris and having the same education and work experience as Harris who could not
sustain sufficient concentration, persistence or pace to do even simple, routine tasks on a regular
and continuing basis for an 8-hour day, 5-days each week, for a 40-hour work week or
equivalent.  Tr. 56.  The VE indicated that there would be no work available to the described
individual.  Tr. 56.

In response to questions from Harris's counsel, the VE indicated that the vocational
region that he was using was the State of Ohio.  Tr. 57.  The VE also indicated that if an
individual were required to miss work three to five times each month for medical appointments,
the individual would be considered unable to perform the jobs described by the VE.  Tr. 57.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the
existence of a disability.  "Disability" is defined as the "inability to engage in any substantial
gainful activity by reason of any medically determinable physical or mental impairment which
can be expected to result in death or which has lasted or can be expected to last for a continuous
period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy[8] . . . .

42 U.S.C. § 423(d)(2)(A).

---

[8] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the
region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[9] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[10] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

---

[9] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[10] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

## IV. The ALJ's Decision

In his September 1, 2011, decision, the ALJ made the following findings:[11]

1.      Harris had not engaged in substantial gainful activity since January 25, 2010.  Tr. 22.

2.      Harris had the following severe impairments: status post left testicular cancer with no lymphovascular invasion, ilioinguinal neuritis, post traumatic stress disorder, panic disorder with agoraphobia, and major depressive disorder, recurrent, moderate.  Tr. 22.  Harris had non-severe impairments of a midline abdominal hernia and emphysematous lung changes.  Tr. 22.

3.      Harris did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr.  22-23.

4.      Harris had the RFC to perform medium work except limited to a low stress job defined as requiring no more than occasional decision making and no more than occasional changes in the work setting, no production or fact [sic] paced work, occasional interaction with coworkers, and no interaction with the public.  Tr. 24-27.

5.      Harris was capable of performing his past relevant work as a stock clerk. Tr. 27.

6.      Alternatively, based on Harris's age (born in 1979 and 30 years old on the date the application was filed), education (at least a high school education and able to communicate in English) and work experience there were other jobs that exist in significant numbers in the national economy that Harris could perform, including laundry worker, industrial cleaner, and dry cleaner helper.  Tr. 28-29.

Based on the foregoing, the ALJ determined that Harris had not been under a disability since January 25, 2010, the date the application was filed.  Tr.  29.

## V. Parties' Arguments

### A.      Plaintiff's arguments

Plaintiff presents five arguments for the Court's consideration. Doc. 16, Doc. 18.

---

[11] The ALJ's findings are summarized.

First, Harris argues that the ALJ's hypothetical question to the VE, which included a limitation of a "work environment with no production rate or pace work," did not sufficiently account for the ALJ's RFC restriction of "no production or fact [sic] paced work." Doc. 16, pp. 2-3, Doc. 18, pp. 2-3.

Second, Harris argues that the ALJ gave "great weight" to state agency reviewing physician Dr. Goldsmith's opinion but failed to incorporate into the RFC Dr. Goldsmith's limitations on strict production quotas, time constraints, or superficial interaction with a familiar few.  Doc. 16, pp. 3-5, Doc. 18, p. 3.

Third, Harris argues that the ALJ improperly evaluated the opinion of Harris's treating psychologist Dr. Haglund.  Doc. 16, pp. 5-6, Doc. 18, pp. 3-4.  He asserts that the ALJ did not provide good reasons for the weight provided to Dr. Haglund's opinion.  Doc. 16, pp. 5-6, Doc. 18, pp. 3-4.

Fourth, Harris argues that the ALJ erred at Step Four when he concluded that Harris was capable of performing his past work as a stock clerk.  Doc. 16, pp. 6-7, Doc. 18, pp. 4-5.  Harris asserts that, to support his Step Four finding, the ALJ relied on VE testimony in response to a faulty VE hypothetical.  Doc. 16, pp. 6-7, Doc. 18, pp. 4-5.  Harris also asserts that his past work as a stock clerk was not past *relevant* work because it was not substantial gainful activity.  Doc. 16, pp. 6-7, Doc. 18, pp. 4-5.  Finally, with respect to the ALJ's Step Four finding, Harris asserts that the RFC limited Harris to medium work, which meant that Harris could stand and/or walk for six hours per workday but, when Harris performed his past work as stock clerk, he stood and/or walked for eight hours.  Thus, Harris argues that the ALJ's Step Four finding is at odds with his RFC finding.  Doc. 16, pp. 6-7, Doc. 18, pp. 4-5.

Fifth, Harris argues that the ALJ erred in his Step Five determination for three reasons: (1) the ALJ relied upon VE testimony in response to a faulty VE hypothetical; (2) the VE's testimony regarding the number of jobs available for dry cleaner helpers in Ohio was incorrect; and (3) the ALJ improperly relied on statewide rather than regional job numbers.  Doc. 16, pp. 7-8, Doc. 18, p. 5.

**B.    Defendant's arguments**

In response, Defendant argues that the RFC and the VE hypothetical upon which the ALJ relied are virtually identical and that Harris's argument that "no production or fast-paced work" and "no production rate or pace work" do not have the same meaning is unsupported.  Doc. 17, pp. 16-17.

In response to Harris's arguments regarding the ALJ's treatment of Dr. Goldsmith's opinion, the Commissioner argues that the ALJ properly evaluated and explained the weight provided to that opinion.  Doc. 17, pp. 12-13.  Also, the Commissioner argues that, although the ALJ gave that opinion "great weight," the ALJ was not required to adopt Dr. Goldsmith's opinion verbatim.  Doc. 17, pp. 12-13.

In response to Harris's arguments regarding the ALJ's treatment of the opinion of treating psychologist Dr. Haglund, the Commissioner asserts that the ALJ properly gave less weight to his opinion because he found it inconsistent with Dr. Haglund's own treatment notes. Doc. 17, pp. 13-16.  The Commissioner also asserts that the ALJ sufficiently addressed Dr. Haglund's conclusions with respect to Harris's reported panic attacks when finding that those conclusions were based on self-reports by Harris, who the ALJ did not find to be fully credible. Doc. 17, pp. 13-16.

In response to Harris's argument with respect to the ALJ's Step Four determination, the Commissioner argues that Harris has failed to demonstrate that his earnings at the stock clerk job fell below the substantial gainful activity level.  Doc. 17, pp. 16-18.  The Commissioner also asserts that, at Step Four, the ALJ is only required to find that a claimant could perform his past relevant work as it was generally performed *or* as actually performed by the claimant.  Doc. 17, p. 18.  Thus, the Commissioner argues that the ALJ's determination that Harris could perform the position of stock clerk as generally performed was not in error.  Doc. 17, p. 18.  The Commissioner also asserts that, even if the ALJ erred at Step Four, at Step Five, the ALJ made an alternative finding that there were a significant number of jobs that existed in the national economy that Harris could perform.  Doc. 17, p. 18.

Finally, in response to Harris's Step Five argument, the Commissioner asserts that, based on VE testimony in response to a VE hypothetical that adequately accounted for Harris's functional limitations that the ALJ found were supported by the record, the ALJ concluded that there were a significant number of jobs that existed in the national economy that Harris could perform.  Doc. 17, pp. 18-20.  With respect to Harris's claim that the VE provided faulty job numbers for the position of dry cleaner helper, the Commissioner asserts that the VE identified additional medium level jobs to demonstrate that jobs existed in significant numbers in the national economy.  Doc. 17, pp. 19-20.  The Commissioner also asserts that Harris's argument that the ALJ relied upon too large a region, i.e., Ohio, is without merit because the Commissioner meets its burden at Step Five where there is one occupation existing in significant numbers in the national economy.  Doc. 17, pp. 19-20 (relying on 20 C.F.R. § 416.966(b)).

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

A. **The ALJ relied upon VE testimony in response to a hypothetical that accurately portrayed the limitations as reflected in the RFC and thus the VE testimony may serve as substantial evidence**

Harris asserts that the ALJ relied upon on a VE hypothetical question that omitted his own RFC limitation of fast-paced work. Doc. 16, pp. 2-3, Doc. 18, pp. 2-3. The VE hypothetical question upon which the ALJ relied required the VE to assume:

> an individual the Claimant's age, education and work experience, who is limited to the full range of medium exertional work as defined in the <u>Dictionary of</u>

Occupational Titles; limited to a low-stress job defined as no more than occasional decision-making required and no more than occasional changes in a work setting; *limited to a work environment with no production rate or pace work*; no interaction with the public; and only occasional interaction with co-workers.

Tr. 54 (emphasis supplied in italics).

The ALJ determined that Harris had the RFC to:

perform medium work as defined in 20 CFR 416.967(c) except he is limited to a low stress job defined as requiring no more than occasional decision making and no more than occasional changes in the work setting, *no production or fact* [sic] *paced work*, occasional interaction with coworkers, and no interaction with the public.

Tr. 24 (emphasis supplied in italics).

Harris asserts that, because the VE hypothetical did not include a limitation as to "fast-paced" work, the VE never addressed the question of speed. Harris's argument is misplaced. The VE was asked to consider a limitation as to both production and pace. Thus, the VE did consider the question of speed.

Harris also argues that the VE hypothetical was impermissibly less restrictive than the RFC. However, the VE hypothetical was actually more restrictive than the RFC because a restriction to no pace work encompasses fast-paced work as well as something less than fast-paced work. Since the VE hypothetical accurately portrayed that Harris had limitations with respect to both production and pace, the VE's responses to that hypothetical question may serve as substantial evidence in support of the ALJ's determination. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 20)10) ("In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of a conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments."); *see also Moore v. Comm'r of Soc. Sec.*, 2013 WL 6282681, * 4-6 (N.D. Ohio

Dec. 4, 2013) (M.J. White) (rejecting claimant's argument that, because the RFC and hypothetical question were not identical, the ALJ erred in relying upon responses to that hypothetical).

Accordingly, for the reasons discussed herein, Harris has failed to demonstrate error with respect to the VE hypothetical upon which the ALJ relied.

**B.      The ALJ properly considered and explained the weight provided to state agency reviewing physician Dr. Goldsmith's opinion**

Harris argues that the ALJ gave "great weight" to Dr. Goldsmith's opinion but failed to adequately explain why Dr. Goldsmith's restrictions on strict production quotas, time constraints and superficial social interaction with a familiar few were not incorporated into the RFC.  Doc. 16, pp. 3-5, Doc. 18, p. 3.   A review of the ALJ's decision and ultimate RFC determination demonstrate that the ALJ properly considered and explained the weight provided to Dr. Goldsmith's opinion.[12]

In conducting his review, Dr. Goldsmith found that Harris had some limitations as a result of mental impairments but opined that Harris "is still able to perform simple to moderately complex, routine work in a low-stress environment without strict production quotas or time constraints.  He is limited to superficial social interaction with a familiar few." Tr. 291.  Harris argues that the ALJ failed to account for Dr. Goldsmith's opinion with respect to strict production quotas or time constraints. Doc. 16, p. 4.  Harris's argument is without merit.  In the RFC, the ALJ limited Harris "to a low stress job defined as requiring . . . no production or fact [sic] paced work." Tr. 24.  Thus, the RFC sufficiently accounted for Dr. Goldsmith's opinion that Harris could work in an environment without strict production quotas or time constraints.

---

[12] While Harris does not argue that Dr. Goldsmith was a treating physician, the Court notes that Dr. Goldsmith was not a treating physician and his opinion therefore was not entitled to controlling weight.

Harris also argues that the ALJ did not sufficiently incorporate into the RFC Dr. Goldsmith's opinion that Harris is "limited to superficial social interaction with a familiar few," (Tr. 291).  Doc. 16, pp. 3-5; Doc. 18, p. 3.  This argument is also without merit.  In the RFC, the ALJ accounted for limitations in social interaction by limiting Harris to "occasional interaction with coworkers, and no interaction with the public."  Tr. 24.  While this limitation is not as restrictive as Dr. Goldsmith's limitation with respect to social interaction, the regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant medical and other evidence" of record.  20 C.F.R. §§ 416.945(a); 416.946(c), *see also Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ – not a physician – ultimately determines a Plaintiff's RFC").  Thus, even where an ALJ provides "great weight" to an opinion, an ALJ is not necessarily required to adopt wholesale limitations contained therein. *Moore*, 2013 WL 6282681, * 7-8 (N.D. Ohio Dec. 4, 2013) (M.J. White) (relying in part on *Lambert-Newsome v. Astrue*, 2012 WL 2922717, * 6 (S.D.Ill. July 17, 2012) when concluding that, although an ALJ provided great weight to a medical opinion, the decision was not unsupported by substantial evidence because limitations contained in that opinion were not incorporated into the RFC).

Furthermore, in his decision, the ALJ addressed Harris's counsel's argument regarding Dr. Goldsmith's opinion with respect to social interaction.  Tr. 27.  The ALJ explained, "I am not willing to change the context of limited social interaction in the workplace to the extent argued by Counsel, although I have limited him to no interaction with the public and occasional interaction with coworkers.  Following Counsel's logic, the claimant could never meet any new people or interact with anyone whom he does not know, a proposition that is clearly not

supported by the medical records."  Tr. 27.  While Harris disagrees with the ALJ's rationale, the ALJ sufficiently explained why he did not incorporate Dr. Goldsmith's more restrictive social interaction limitation into the RFC.

Accordingly, for the reasons discussed herein, Harris has failed to demonstrate error in the ALJ's consideration of or explanation of his treatment of Dr. Goldsmith's opinion.

## C.      The ALJ properly considered and explained the weight provided to treating psychologist Dr. Haglund's opinion

Harris argues that the ALJ did not provide good reasons for the weight provided to the opinion of his treating psychologist Dr. Haglund.  Doc. 16, pp. 5-6, Doc. 18, pp. 3-4.  In response, the Commissioner asserts that the ALJ properly gave less weight to Dr. Haglund's opinion because he found his opinion to be inconsistent with Dr. Haglund's own treatment notes.  Doc. 17, pp. 13-16.  The Commissioner also asserts that the ALJ sufficiently addressed Dr. Haglund's conclusions with respect to Harris's reported panic attacks when finding that those conclusions were based on self-reports by Harris, who the ALJ did not find to be fully credible.  Doc. 17, pp. 13-16.

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  Further, when deciding the weight to be given, an ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the

examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 416.927(c). However, while an ALJ's decision must include "good reasons" for the weight provided, the ALJ is not obliged to provide "an exhaustive factor-by-factor analysis." *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

> With respect to Dr. Haglund's opinion the ALJ stated:

> The claimant's former counselor at Nord Center, Thomas Haglund, PhD, provided a medical source statement dated April 12, 2010, in which he reported that the claimant has anxiety and depression, low self esteem, and difficulty sleeping. He noted that claimant's ability to remember, understand and follow directions was intact. There were no reported problems maintaining attention, although he reported that the claimant's panic episodes would significantly affect his concentration and ability to stay on task or cope with stress.

> I find that Dr. Haglund's opinion is entitled to some weight although his conclusion concerning panic attacks is based on self-reporting by the claimant, whom I do not find to be fully credible (see credibility discussion below).

> ***

> Counsel also appears to argue that the opinions of Dr. Solomon[13] and Dr. Haglund are controlling. However, for the reasons set forth above, I do not find them to be persuasive, or even consistent with their own treatment notes.

Tr. 26.

Harris argues that, because Dr. Haglund's diagnosis of panic disorder was based on psychological "signs"[14] rather than "symptoms,"[15] the ALJ could not discount Dr. Haglund's

---

[13] On May 23, 2011, Dr. Marc Solomon provided an opinion with respect to Harris's physical impairment. Tr. 513. In particular, he offered his opinion that Harris was "unable to work at this time due to his left groin pain." Tr. 513. Harris does not assert error with respect to the ALJ's treatment of Dr. Solomon's May 23, 2011, opinion.

[14] "Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities

opinion on the basis that Harris was not fully credible.  Doc. 16, pp. 5-6, Doc. 18, pp. 3-4.   He

asserts that "Dr. Haglund's diagnosis of panic disorder (Tr. 263) was consistent with footnote 2

of SSR 96-4p."[16]  Doc. 16, p. 6.  Thus, he argues that Dr. Haglund cannot be said to have been

deceived by false reports of panic attacks.  Doc. 16, p. 6.  Harris's argument is misplaced. First,

he fails to identify the "anatomical, physiological, or psychological abnormalities" signs that Dr.

Haglund observed apart from "Harris's statements (symptoms)."  20 C.F.R. § 416.928(b).

Second, the ALJ did not reject Dr. Haglund's diagnosis of panic disorder. In fact, at Step Two,

the ALJ found that one of Harris's severe impairments was panic disorder with agoraphobia.  Tr.

22.  Rather, the ALJ found that Dr. Haglund's opinion was only entitled to some weight because

Dr. Haglund's *conclusions* regarding panic attacks, which included his opinion that Harris's

"panic episodes would significantly affect his concentration and ability to stay on task or cope

with stress" (Tr. 265), were based on self-reporting by Harris, whom the ALJ did not find fully

credible.  Tr. 26.  Harris does not challenge the ALJ's credibility determination but appears to

suggest that the ALJ's reliance in part on that credibility determination when weighing Dr.

Haglund's opinion is impermissible.  However, when determining what weight to provide to a

treating physician opinion an ALJ is to consider various factors, including the supportability of

the opinion; the consistency of the opinion with the record as a whole; and other factors that tend

to support or contradict the opinion.  *Bowen*, 478 F.3d at 747; 20 C.F.R. § 416.927(c).  The ALJ

did this.  In finding Dr. Haglund's opinion unpersuasive, the ALJ's consideration of Harris's

---

of behavior, mood, thought, memory, orientation, development, or perception.  They must also be shown by observable facts that can be medically described and evaluated."  20 C.F.R. § 416.928(b).

[15] "Symptoms are your own description of your physical or mental impairment."  20 C.F.R. § 416.928(a).  For example, "symptoms, such as pain, fatigue, shortness of breath, weakness or nervousness, are an individual's own perception or description of the impact of his or her physical or mental impairment(s)."  SSR 96-4p, n.2.

[16] SSR 96-4p clarifies how symptoms are to be evaluated.  In the context of discussing what evidence may establish the existence of a medically determinable impairment, Footnote 2 of SSR 96-4p addresses when a symptom may represent a sign.

credibility was proper.  *See Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, * 442 (6th Cir. 2010) ("When deciding if a physician's opinion is consistent with the record, the ALJ may consider evidence such as the claimant's credibility . . . ").  Further, the ALJ explained that Dr. Haglund's opinion was entitled to less than controlling weight because it was not consistent with his own treatment notes.  Tr. 27.

Moreover, while the ALJ found Dr. Haglund's opinion was not entitled to controlling weight and sufficiently explained that decision, the ALJ accounted for limitations in concentration and ability to stay on task or cope with stress.  For example, in the RFC, the ALJ limited Harris "to a low stress job defined as requiring . . . no more than occasional changes in the work setting, no production or fact [sic] paced work . . ."  Tr. 24.

Accordingly, for the reasons discussed herein, Harris has failed to demonstrate that the ALJ improperly considered Dr. Haglund's opinion and/or failed to provide good reasons for the weight provided to that opinion.[17]

**D.      The ALJ's Step Five analysis is supported by substantial evidence**

Harris argues that the ALJ erred in his Step Five determination for three reasons: (1) the ALJ relied upon VE testimony in response to a faulty VE hypothetical; (2) the VE's testimony regarding the number of jobs available for dry cleaner helpers in Ohio was incorrect; and (3) the ALJ improperly relied on statewide rather than regional job numbers.  Doc. 16, pp. 7-8, Doc. 18, p. 5.

---

[17] While not reflected in the ALJ's decision and not necessary to the Court's determination, the Court finds it interesting that, in August of 2010, four months after completing the Mental Status Questionnaire and Daily Activities Questionnaire, Dr. Haglund stated that he was unable to complete forms for the Bureau of Disability Determination because he did "not know client well enough" to complete the paperwork.  Tr. 384.

### a. The ALJ relied upon a proper VE hypothetical

With respect to Harris's first argument, as discussed above, the VE hypothetical question upon which the ALJ relied accurately portrayed the limitations that the ALJ found were supported by the evidence. Thus, the VE's testimony in response to that hypothetical question constitutes substantial evidence upon which the Commissioner may rely to support the decision. *See Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) ("[i]n order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence . . . [the] [h]ypothetical questions . . . need only incorporate those limitations which the ALJ has accepted as credible") (internal citations and quotations omitted).

### b. The ALJ properly found that there are other jobs that Harris can perform that exist in significant numbers in the national economy

The Commissioner asserts that, to the extent that the VE's job numbers with respect to the dry cleaner job were in error, there still remained a significant number of jobs in the national economy that Harris could perform. Doc. 17, pp. 19-20. The Court agrees.

Here, in concluding that there were other jobs that exist in significant numbers in the national economy that Harris could perform, the ALJ relied upon the VE's testimony that the following jobs would be available to the hypothetically described individual: (1) laundry worker with approximately 3,000 jobs available statewide and 80,000 jobs available nationwide; (2) industrial cleaner with approximately 60,000 jobs available statewide and 1,000,000 available nationwide; and (3) dry cleaner helper with approximately 10,000 jobs available statewide and 40,000 available nationwide. Tr. 54-55. In light of the foregoing VE testimony, even if the dry cleaner job were eliminated because of an error in the numbers cited by the VE, there is still evidence of a significant number of jobs available in the national economy, i.e., approximately

63,000 jobs available statewide and 1,080,000 jobs available nationwide. *See* 20 C.F.R. § 416.966(b) ("Work exists in the national economy when there is a significant number of jobs (in *one or more* occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications.") (emphasis supplied); *Nejat v. Comm'r of Soc. Sec.*, 359 F. Appx. 574, 579 (6th Cir. 20*09) (2000 jobs found to be a significant number after eliminating two out of the three jobs the VE testified that claimant could perform).

> **c.  The ALJ properly relied upon statewide and nationwide job data when determining that there were other jobs that existed in significant numbers in the national economy that Harris could perform**

Harris argues that, because the VE did not provide regional job data, the VE's testimony cannot constitute substantial evidence.  The Commissioner asserts that Harris's argument is without merit because the Commissioner meets its burden at Step Five where there is one occupation existing in significant numbers in the national economy.  Doc. 17, pp. 19-20 (relying on 20 C.F.R. § 416.966(b)).

"'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives *or* in several regions of the country."  42 U.S.C. § 1382c(a) (emphasis supplied).[18]  Further, the Regulations provide that when considering whether work exists in significant numbers either in the region where a claimant lives or in several other regions of the country, "[i]t does not matter whether - -  (1) [w]ork exists in the immediate area in which you live . . . "  20 C.F.R. § 416.966(a)(1).  Moreover, while "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where you [a claimant] live are not considered work which exists in the national economy," 20 C.F.R. § 416.966(b), that is not the situation presented in this case.  In *Hall v. Bowen*, the Sixth

---

[18] Harris cites the foregoing provision but focuses on the language "in the region where such individual lives."  Doc. 16, p. 8.

Circuit provided examples of criteria that might be considered when determining whether work exists in significant numbers[19] but also indicated that, "the difficult task of enumerating exactly what constitutes a 'significant number' . . . should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation." 837 F.2d 272, 275 (6th Cir. 1988)

In support of his argument that the ALJ relied on too large a region, i.e., State of Ohio, Harris asserts that he is not a worker who commutes long distances across the state. Doc. 16, p. 6. He does not attempt to argue why, even after excluding the dry cleaner position, 1,080,000 jobs nationwide and 63,000 jobs statewide (the totals for the other positions) do not constitute a significant number of jobs in the national economy. Without more than a statement that Harris is not a worker who would commute across the state and in light of the fact that the evidence does not demonstrate that the jobs cited by the VE are very limited in numbers or isolated, the Court cannot conclude that the ALJ erred in relying upon the VE testimony to find that there were a significant number of jobs that existed in the national economy that Harris could perform. Even if it was error for the ALJ not to elicit regional numbers from the VE, in this case, considering the number and types of jobs available nationwide and statewide, Harris has failed to demonstrate that such an error was not harmless.

## E.        Harris's Step Four argument

In addition to asserting error at Step Five, Harris argues that the ALJ erred at Step Four when he concluded that Harris was capable of performing his past work as a stock clerk. Doc. 16, pp. 6-7, Doc. 18, pp. 4-5. However, at Step Five, the ALJ alternatively found that there were

---

[19] For example, some of those criteria might include "the level of the claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance the claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on. *Hall*, 837 F.2d at 275.

jobs that existed in significant numbers that Harris could perform.  Tr. 28-29.  As discussed

above, the Court has determined that the ALJ's Step Five determination is supported by

substantial evidence.  Thus, it is not necessary for the Court to address Harris's Step Four

argument.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.


Dated:  January 30, 2014

_____

Kathleen B. Burke
United States Magistrate Judge